**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARYANN PRANGE, | : | |
|     Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:22-CV-1133 (JCH) |
| v. | : | |
| | : | |
| KASZMER J. ARSZYLA, JR., | : | |
|     Defendant. | : | JANUARY 5, 2023 |
| | : | |

**RULING ON PLAINTIFF'S MOTION FOR PREJUDGMENT REMEDY (DOC. NO. 3)**

**I.      INTRODUCTION**

Plaintiff Maryann Prange ("Ms. Prange") asks this court to attach property of the defendant, Kaszmer Arszyla ("Mr. Arszyla"), as a prejudgment remedy pursuant to Connecticut General Statutes section 52-278a et seq. to secure the sum of $544,587.81.  See Application for Prejudgment Remedy ("Pl.'s Mot.") (Doc. No. 3); Affidavit of Maryann Prange ("Prange Aff.") (Doc. No. 19); see also Response to Defendant's Objection to Prejudgment Remedy ("Pl.'s Reply) (Doc. No. 27).  Mr. Arszyla opposes this Motion.  See Objection to Prejudgment Remedy ("Def.'s Opp.").

The court held a multi-day hearing on Ms. Prange's Motion to determine whether there is probable cause to sustain the validity of Ms. Prange's claims.  See Minute Entry (Doc. Nos. 39, 44, 55); see also Prejudgment Remedy Hearing Vol. I ("Trans. Vol. I") (Doc. No. 46); Prejudgment Remedy Hearing Vol. II ("Trans. Vol. II") (Doc. No. 47).  Ms. Prange and Mr. Arszyla filed their post-hearing briefs on December 2nd and 7th, 2022, respectively.  See Plaintiff's Post-Hearing Brief ("Pl.'s Mem.") (Doc. No. 49); Defendant's Trial Memorandum ("Def.'s Mem.") (Doc. No. 50).  In addition, the court

considered Mr. Arszyla's two special defenses of waiver and unclean hands.  <u>See</u> Def.'s

Mem. at 12–13; <u>see also</u> Conn. Gen. Stat. § 52-278d(a)(4) (requiring the court to grant

an application for prejudgment remedy only after, <u>inter alia</u>, "taking into account any

defenses, counterclaims or set-offs").

　　　For the reasons discussed below, the court grants, in part, Ms. Prange's Motion

for Prejudgment Remedy (Doc. No. 3).

## II.　　BACKGROUND AND PROCEDURAL HISTORY[1]

　　　This case is between a brother and a sister whose aunt became legally

incapacitated in 2018 and then passed away in 2020.  The sister, Ms. Prange, became

an agent under a springing durable power of attorney for her aunt, Helen Monica Carroll

("Monica"), after Monica became legally incapacitated on July 13, 2018.  <u>See</u> Affidavit

that Power of Attorney is in Full Force and Effect ("POA Docs"), Pl.'s Ex. 2 at 1; <u>see also</u>

<u>id.</u> (attesting that Ms. Prange's role as an agent under Power of Attorney for Monica

was in "full force and effect" on October 1, 2018).  The brother, Mr. Arszyla, was

designated as a co-agent under that Power of Attorney on March 12, 2019, because

Ms. Prange sought to name him.  Minute Order from Superior Court of California,

County of San Diego Central, Pl.'s Ex. 3 (ordering that Ms. Prange, as "acting agent and

attorney in fact [for Monica], has the authority to name and does name as successor co-

agent, . . . [Mr.] Arszyla") (Doc. No. 32-3); Prange Aff. ¶¶ 7 ("I sought to have [Mr.

Arszyla] appointed as a co-agent . . . with the agreement that [he] would 'take care of all

financial matters for Monica.'"), 8.  Mr. Arszyla therefore received and handled most of

---

[1] The facts outlined in this section are not in dispute.  Additional facts, as found by this court following the hearing held on November 9 and 21, 2022, are described in Section VI, below.  A hearing was held on December 14, 2022.  However, the court does not rely on evidence taken that day.  <u>See</u> note 3, <u>infra</u>.

Monica's financial correspondence, such as bills and investment notices.  In addition to acting as co-agents under the springing durable Power of Attorney, Ms. Prange and Mr. Arszyla also served as co-trustees for Monica's living trust.  See, e.g., Prange Aff. ¶ 31. Monica's assets were many, including properties and investments, with a total value "in excess of three million dollars[.]"  See Continued Prejudgment Remedy Hearing Volume II ("Tr. Vol. II") at 178:8–10 (Doc. No. 47).  One such asset was the annuity that is the subject of this action.

On June 24, 2019, nearly one year and four months prior to Monica's passing, notice was sent that Monica's annuity with Jackson National Life Insurance Company (hereinafter, the "Jackson Annuity") would reach its Maturity Date the following year. See Important Notice from Jackson, Def.'s Ex. A at 1 (Doc. No. 38-1).  The Jackson Annuity had two equal, fifty percent, beneficiaries: Ms. Prange and her sister, Joan Lavorgna ("Joan").  Jackson National Life Insurance Company Confirmation of Beneficiary Change, Pl.'s Ex. 1 (Doc. No. 41-1).  Mr. Arszyla notified Ms. Prange of the approaching Maturity Date on this Jackson Annuity, explaining that the annuity's balance "had to be put in another account before [Monica] turned 96[;] . . . [Mr. Arszyla and Ms. Prange] had to change it to another annuity so [they] wouldn't lose it." Prejudgment Remedy Hearing Volume I ("Tr. Vol. I") at 54:4–8 (Doc. No. 46).  Mr. Arszyla sent Ms. Prange the signature forms to roll over the balance of the Jackson Annuity into another annuity, and Ms. Prange returned the completed signature pages by overnight mail the next day.  See "roll over Jackson Anuity [sic]" Email ("6/2/20 Email"), Pl.'s Ex. 4 (Doc. No. 32-4); Tr. Vol. I at 66:18–25; Check to USPS, Pl.'s Ex. 6 (Doc. No. 32-6).  The Jackson Annuity was then "rolled over" into a new annuity with

3

Nationwide Life Insurance Company (hereinafter, the "Nationwide Annuity"), as Ms. Prange and Mr. Arszyla had agreed.  See, e.g., Tr. Vol. I at 75.  On the date of Monica's death, the Nationwide Annuity was valued at $363,058.54.  Nationwide Letter Notifying Date of Death Value ("Nationwide DoD Value Letter"), Pl.'s Ex. 9 (Doc. No. 32-9).

Mandatory distributions began on the Nationwide Annuity in January 2021 to the two beneficiaries: Joan received a distribution based on a sixty percent designation, and the other beneficiary, now Mr. Arszyla, received a distribution based on the remaining forty percent.  Tr. Vol. II at 248:20–22, 249:22–24.  Under the beneficiary designations of the Jackson Annuity, Ms. Prange would have been entitled to a distribution, based on a fifty percent designation, of $181,529.27.  Once the annuity had been rolled over into a new annuity with Nationwide with the beneficiaries changed, however, Ms. Prange was no longer a beneficiary and received nothing.  Tr. Vol. I at 75:15–25.

When Ms. Prange called Mr. Arszyla on January 25, 2021, to inquire about her share of the Nationwide Annuity, Mr. Arszyla told her that he "took [her] off of it."  Id. at 75:15–18, 76:7–8.  Referring to a prior conflict not relevant to the Motion before this court, Mr. Arszyla explained that "Joan and her family . . . should have gotten more from Monica's estate."  Id at 76:10–12.  Mr. Arszyla felt that "it wasn't fair what happened in the past and what was going on. . . .  Things weren't right and [Ms. Prange] needed to make things right . . . ."  Tr. Vol. II at 198:12–13, 198:19–21.[2]  Ms. Prange learned that

---

[2] The quoted testimony above is that of Mr. Arszyla in response to questioning by his attorney about a conversation Mr. Arszyla allegedly had with Ms. Prange, prior to the change in beneficiaries that accompanied the rollover of the Jackson Annuity to the Nationwide Annuity, about the change in beneficiaries.  See generally id. at 197–201.

However, the court quotes it above because the quote illustrates the reasoning behind Mr. Arszyla's decision to change the beneficiary designations.  See e.g., Tr. Vol. I at 76–77, 83–84 (Ms.

4

Mr. Arszyla was designated the forty percent beneficiary in later discussions with him and their attorney, Rosemary Leonard ("Attorney Leonard"),[3] who jointly represented them on the subject of administering Monica's trust as co-trustees.  Tr. Vol. I at 78:9–13; 84:1–85:12.  As the other beneficiary on the Nationwide Account, Mr. Arszyla's forty percent entitles him to approximately $145,223.41.  Tr. Vol. II at 244:22–24.

Believing that she was wrongfully deprived of her beneficiary status under Monica's annuity, Ms. Prange sought the return of her share from Mr. Arszyla prior to commencing litigation.  See generally Prange Aff. ¶ 31; Tr. Vol. I at 81–82.  When that failed, Ms. Prange filed a complaint in Connecticut state court, in conjunction with which she sought a prejudgment remedy ("PJR") of attachment "to secure the sum of $544,587.81" on July 27, 2022.  See Notice of Removal at 8 (Doc. No. 1).  Claiming diversity jurisdiction, Mr. Arszyla removed the case to this court on September 7, 2022. Id. at 1.

In her Complaint, Ms. Prange alleges the following: (1) elder exploitation in violation of Connecticut General Statutes ("C.G.S.") § 17b-462; (2) fraudulent non-disclosure; (3) constructive fraud; (4) unjust enrichment; (5) conversion; (6) civil theft in violation of C.G.S. § 52-564; and (7) negligent infliction of emotional distress.  See generally Complaint ("Compl.") (Doc. No. 18).  Although listed as a separate count (8),

---

Prange describing her conversations with Mr. Arszyla after she discovered she was no longer a beneficiary under the Nationwide Annuity).  The quoted portion is provided for context.

[3] In the prejudgment remedy hearing before this court, testimony and evidence was also provided regarding Attorney Leonard's attempts at mediating the conflict over beneficiary designations before the instant action was filed.  This evidence was proffered as further proof of Ms. Prange's version of events. However, Attorney Leonard raised concerns regarding the possible existence and scope of attorney-client privilege and confidentiality.  While this court does not find a conflict or privilege, testimony from and regarding Attorney Leonard is not relied on in this Ruling because the record without it is sufficient to support this court's Ruling.

she seeks "the equitable imposition of a constructive trust" over Arszyla's portion of the disputed Annuity.  Id. at ¶ 69.  Of issue now before this court is Ms. Prange's Motion for Prejudgment Remedy in the form of an attachment to secure "$544,587.81 plus costs and attorney's fees."  Pl.'s Mem. at 1.

## III.   LEGAL STANDARD

Rule 64 of the Federal Rules of Civil Procedure permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action.  See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 436 n.10 (1974); Roberts v. TriPlanet Partners, LLC, 950 F. Supp. 2d 418, 420 (D. Conn. 2013).  Rule 64 provides, in pertinent part, that the "commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64(a).

Connecticut law allows a court to grant a motion for prejudgment remedy (hereinafter, "PJR") upon a showing by the movant that "there is probable cause to sustain the validity of the plaintiff's claim."  Conn. Gen. Stat. § 52–278d(a).[4]

---

[4] In addition to a finding of probable cause after "taking into account any defenses, counterclaims or set-offs," section 52-278d(a) requires a court to determine:

> (2) whether payment of any judgment may be rendered is adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy.

Id.  The court received no evidence of insurance, nor was an argument made at the hearing or post-hearing briefs that property was exempt.  In addition, the defenses argued by Mr. Arszyla

Connecticut courts commonly describe the legal notion of probable cause as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  Orsini v. Tarro, 80 Conn. App. 268, 272 (2003) (quotations and citations omitted).  Probable cause is properly understood to be "a flexible common sense standard" that is less demanding than standards which require findings to be made based on a preponderance of the evidence or even a likelihood of success.  See id.  Further, a plaintiff need only establish "probable cause that a judgment will issue in an amount equal to, or greater than, the amount of the prejudgment remedy sought."  TES Franchising LLC v. Feldman, 286 Conn. 132, 147 (2008).

## IV.     ANALYSIS[5]

As a preliminary matter, to succeed on her Motion, Ms. Prange need only establish a "bona fide belief in the existence of the facts essential under the law" to support "probable cause that a judgment will issue in an amount equal to, or greater than, the amount" of the PJR sought.  Orsini, 80 Conn. App. at 272; TES Franchising LLC v. Feldman, 286 Conn. 132, 147 (2008).  Thus, a PJR may issue if even one of Ms.

---

either do not apply to or do not overcome a finding of probable cause for the Counts outlined below.  See Sections IV.B–D, infra.

[5] Although Mr. Arszyla filed an Opposition to Ms. Prange's PJR Motion, and Ms. Prange, in turn, filed a Reply, the court addresses primarily the arguments presented in the parties' Post Hearing Briefs.  In his Opposition Memorandum, Mr. Arszyla made two arguments against the PJR Motion: (1) that "the parties have already settled this matter, as more fully articulated in [Mr. Arszyla's Motion to Enforce Settlement]"; and (2) that Mr. Arszyla "owns no property" in Connecticut that the court can attach by way of PJR.  Def.'s Opp. at 1.  Mr. Arszyla's Motion to Enforce Settlement was orally withdrawn at the November 21, 2022 hearing.  See Minute Entry (Doc. No. 44) (terminating Motion for Settlement).  Mr. Arszyla's second argument was not pursued in his Post Hearing Brief.  See generally Def.'s Mem.

Prange's claims is supported by probable cause at or exceeding the amount granted.[6]

Moreover, the findings of fact made by the court are based upon the evidence provided

at the PJR hearing, and "[t]hese findings are for the purposes of adjudicating the

application for [PJR]" only.  Kenwell Trading Ltd. v. Porcelen Ltd. CT LLC, No. 3:22-CV-

00248 (KAD), 2022 WL 3359159, at *2 (D. Conn. Aug. 15, 2022).  The findings of fact

and the legal analysis utilized in this Ruling "shall not be binding on the [c]ourt or the

parties at later stages of the litigation."  Id. (citing Roberts, 950 F. Supp. at 421; Walsh

v. St. Denis, Civ. No. 3:17CV01032(AWT), 2017 WL 4163662, at *3 (D. Conn. Sept. 20,

2017)).

     A.    <u>Findings of Facts from PJR Hearing</u>

     As Ms. Prange states in her Post Hearing Brief, this case "boils down to a

question of whether [her] testimony is facially creditable."  Pl.'s Mem. at 13.  After

hearing the testimony of both Mr. Arszyla and Ms. Prange, as well as the evidence both

parties provided, the court credits Ms. Prange's testimony and additional submissions

for the purposes of this Ruling.  Most critically, the court credits Ms. Prange's testimony

that she never agreed to any changes to be made to the beneficiary designations and

she did not know of such changes until after Monica's death.  See, e.g., Tr. Vol. I at

75:15–18, 106:4–11.  The court does not credit Mr. Arszyla's testimony that Ms. Prange

had agreed to the "60/40 beneficiary change of the Jackson [Annuity]" in a phone call

with Mr. Arszyla in May 2020, before she signed the forms.  Tr. Vol. II at 202:16–21.

The court found Ms. Prange's demeanor, as well as the substance of her testimony, to

---

[6] Thus, the court only addresses Counts One and Two of Ms. Prange's Complaint because they are sufficient to support a grant of Ms. Prange's Motion in the amount designated below by this court. The court also, therefore, limits its consideration of Mr. Arszyla's affirmative defenses to those which may defeat Counts One and Two.

be forthright and credible.  Moreover, her testimony appeared candid and, critically, the answers she gave in direct and cross examination were corroborated by the evidence, and the absence of evidence.  The court therefore credits Ms. Prange's testimony and finds the following additional facts based on the hearing held on November 9 and 21, 2022.

After notifying Ms. Prange that the Jackson Annuity's Maturity Date was fast approaching, Mr. Arszyla scanned and sent, by email, eight separate PDF pages for Ms. Prange to sign and return in order to effectuate the rollover of the Jackson Annuity into the Nationwide Annuity.  Prange Aff. ¶¶ 16–18; Tr. Vol. I at 61:9–65:18.  None of the pages included in the email set forth the change in beneficiary designation; the text of the email did not mention a change in beneficiaries; Mr. Arszyla did not notify Ms. Prange of his intention to change the beneficiaries; and Ms. Prange did not give her consent to the beneficiary designation change.  See 6/2/20 Email (instructing Ms. Prange to "print out[,] sign[, t]hen scan all of these forms" and to "call [him] when [she] ha[s] it printed out" so he could "walk [her] through it.  Too Too [sic] much paperwork.");  Attachments to 6/2/20 Email ("Email Docs") (Doc. No. 32-5) (containing eight separate PDF scans, seven from Nationwide and one from Jackson, signed by Mr. Arszyla on June 2, 2020); Complete Submitted Nationwide Annuity Application ("Full App."), Pl.'s Ex. 7 (Doc. No. 41-3); Prange Aff. ¶¶ 22–24.  Ms. Prange "did not know about the change in the beneficiary designations."  Prange Aff. ¶ 23; Tr. Vol. I at 69:2–13.  Most importantly, "[i]f [Ms. Prange] had known that [her] brother[, Mr. Arszyla,] was going to fill out the beneficiaries" to remove her and add himself, Ms. Prange would not have signed the forms.  Tr. Vol. I at 70:10–13.

The court does not credit Mr. Arszyla's testimony that he sent a full set of documents to Ms. Prange and discussed the beneficiary change with her.  Not one document in evidence supports that testimony.  Further, it strains credulity that Ms. Prange would surrender her beneficiary status, entitling her to $181,529.27, because her brother, in one conversation, referenced events involving her mother's estate over a decade ago.  See id. at 76:25–78:3.  That Ms. Prange would agree to the change is also implausible in light of Ms. Prange's strongly held view that "Monica had made her beneficiaries for all her estate and her trust the way she wanted it. . . .  [A]s a fiduciary for Monica", Ms. Prange did not think it "was [her] place to change the beneficiaries[.]"  Id. at 70:15–21.

The court also does not credit the testimony that Mr. Arszyla had first mailed the complete application documents to Ms. Prange, and had only emailed copies of the signature pages because she "didn't know where to sign on all the paper[s.]"  Tr. Vol. II at 203:25–204:2.  Mr. Arszyla did not keep a copy of the applications he claims to have "pre-fill[ed out]" and mailed to Ms. Prange.  Id. at 203:4–5, 261:19–22.  Nor does the email's text reflect that he had mailed the forms, or that Ms. Prange had even discussed the forms on the phone.  See 6/2/20 Email.  Rather, the email and its attached signature pages supports Ms. Prange's testimony that Ms. Prange did not receive the full applications in the mail.  Tr. Vol. I at 67:17–21.  Indeed, Mr. Arszyla's claim that Ms. Prange "did not know where to sign" on the allegedly mailed applications is not credited by the court:  if Mr. Arszyla had signed the application allegedly sent in the mail, Ms. Prange would only need to sign next to where Mr. Arszyla's name appeared.  Moreover,

the critical page containing the beneficiary changes had no signature line to confuse Ms. Prange.  See Full App. at 3.

Based on the testimony and evidence adduced to this court in support and opposition of Ms. Prange's PJR Motion, the court discerns two possible scenarios.  One is that Ms. Prange agreed to forego over $181,000 to "make things right" with her brother and sister following a dispute that occurred more than a decade prior, and then either changed her mind or completely forgot.  The other scenario is that Mr. Arszyla, still bitter over a family dispute that occurred more than a decade prior, decided to take advantage of his position as co-agent under power of attorney in charge of financial paperwork to secretly change the annuity designations in the hope that Ms. Prange would not realize it until it was too late.  This court finds, based on the evidence adduced at the PJR hearing and for the sole purposes of Ms. Prange's PJR Motion, the latter scenario to be more probable.

The court turns to Ms. Prange's Complaint to determine whether these facts "would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining" any of its counts.  Orsini, 80 Conn. App. at 272.

B.      Count Two: Fraudulent Nondisclosure

In Count Two of her Complaint, Ms. Prange alleges that the "circumstances of [Mr. Arszyla] asking [her] to sign an annuity exchange application imposed a duty on [him] to disclose all material facts of the annuity exchange application, including the change in beneficiaries."  Compl. ¶ 32.  Mr. Arszyla "intentionally misled" her when he "fail[ed] to disclose that the annuity exchange application would designate [him] as a beneficiary instead of [her]."  Id. at ¶ 35.  Finally, Ms. Prange alleges that Mr. Arszyla "intentionally misled" her by "omitting the beneficiary designation page from the forms"

11

he emailed her to sign, id. at ¶ 36, and that Mr. Arszyla's intent was that Ms. Prange would "make or continue in a mistake in order to induce" her to sign the application making him a beneficiary in her stead, id. at ¶ 37.

Mr. Arszyla argues, however, that Ms. Prange "still cannot prevail because she has not established the necessary elements of fraudulent nondisclosure." Def.'s Mem. at 6. In support of this argument, Mr. Arszyla states simply that "silence cannot give rise to an action", id. (quoting Duksa v. City of Middletown, 173 Conn. 124, 127 (1977)), but he provides no further analysis or application to the facts of this case.

In Connecticut, fraud by nondisclosure "involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak." Sousa v. Sousa, 173 Conn. App. 755, 775 (2017) (internal quotation and citation omitted). "Such a duty is imposed on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." Duksa, 173 Conn. at 127 (internal citations omitted). Finally, the lack of "full and fair disclosure" triggering a finding of fraud "must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." Sousa, 173 Conn. App. at 775 (internal quotation and citation omitted).

While Mr. Arszyla is correct that, ordinarily, silence does not constitute fraud, the very case to which he cites—indeed, the very quote provided in his brief—also defines the exception. See Def.'s Mem. at 6 (citing Duksa, 173 Conn. at 127). Mr. Arszyla does not explain why he did not, in raising the issue of rolling over the Jackson Annuity

before its Maturation Date and providing piecemeal application documents for Ms. Prange's signature, trigger a duty to make a full and fair disclosure of everything that said documents would effectuate.

Mr. Arszyla also argues that this court should evaluate this Count under the standard of clear and convincing evidence, rather than the probable cause standard set forth in the PJR statute.  Id. at 4.  He argues that "Connecticut [c]ourts require that the party asserting a cause of action for fraud must prove the elements by a standard higher than the usual fair preponderance of the evidence[.]"  Id. at 6.  Specifically, Mr. Arszyla argues that the "more exacting clear and convincing standard" applies to the court's analysis of Ms. Prange's claims of fraudulent nondisclosure and constructive fraud.  Id. at 7.  The court disagrees.

While it is true that courts in Connecticut apply a higher standard of proof to fraud claims, the clear statutory standard for a PJR Motion is that of probable cause.  To the extent that this standard is altered when a claim sounding in fraud is at issue, "the plaintiff must establish probable cause to believe that it can prove by clear and convincing evidence that" fraudulent activity occurred.  Hull v. Joyner, No. CV055000206S, 2006 WL 2605708, at *3 (Conn. Super. Ct. Aug. 25, 2006) (finding that the plaintiff had shown probable cause to believe that the plaintiff could prove by clear and convincing evidence that the conveyance caused the transferor to be unable to meet his obligations, and that the conveyance was made with fraudulent intent).  The court finds, based on the record before it, that there is probable cause to believe that Ms. Prange can prove, by clear and convincing evidence, the alleged fraud.

The evidence before this court supports a "bona fide belief" that Mr. Arszyla and Ms. Prange's roles, both as siblings and as co-agents under Monica's power of attorney, were such that Mr. Arszyla handled financial matters and Ms. Prange deferred to and trusted his judgment and proposals.  Further, the court concludes there is probable cause to find, by clear and convincing evidence, Mr. Arszyla's incomplete disclosure of the facts underlying the rollover transaction—that is, the beneficiary change—was intentional, given that Mr. Arszyla was able to make himself a forty percent beneficiary.  Finally, this failure to disclose the beneficiary change operated to Ms. Prange's detriment because she effectively lost over $181,000.  Ms. Prange has therefore met the probable cause standard of likely success on this claim, and a PJR is warranted.

     C.     <u>Count One: Elder Exploitation</u>

Count One of Ms. Prange's Complaint alleges elder exploitation in violation of C.G.S. section 17b-462(a).  Compl. ¶ 30.  Ms. Prange argues that, under C.G.S. section 17b-450, she has been an "elderly person" at all times relevant to this action and that Mr. Arszyla "exploited" her in the sense that he "took advantage of [her] . . . for monetary, personal, or other benefit, gain or profit."  Pl.'s Mem. at 17.  Mr. Arszyla argues that "the [c]ourt heard absolutely no testimony by [Ms. Prange] or any[one else] that [Ms. Prange] was taken 'taken advantage of.'"  Def.'s Mem. at 4.  Although he offers absolutely no legal support for his argument, Mr. Arszyla is adamant that Ms. Prange "was not taken advantage of in any common sense of the term 'taken advantage of', at best she can only argue that she neglected to review the entirety of the application before signing in her fiduciary capacity."  <u>Id.</u> at 5.  The court's findings of fact dictate a different conclusion.

14

Ms. Prange supported Mr. Arszyla's appointment as a co-agent under Monica's springing durable Power of Attorney for the specific purpose of enabling him to more efficiently assist Monica with her financial affairs.  Prange Aff. ¶ 7.  As a direct result of Mr. Arszyla's appointment as co-agent, Ms. Prange stopped receiving Monica's financial correspondence:  it all went to Mr. Arszyla.  See Tr. Vol. I at 92:2–22.  Ms. Prange "trusted [her] brother", id. at 107:1–9, a sentiment for which this court cannot, on the basis of the evidence adduced at the hearing, fault her.  Mr. Arszyla was family.  He was responsible for Monica's finances and, after he became a co-agent under Monica's Power of Attorney, Mr. Arszyla was the only one who consistently received information about Monica's accounts.  Id. at 92:19–22.  In fact, Mr. Arszyla had assisted Monica with her finances since at least 2017, well before he became a co-agent.  Id. at 49:17– 22.  Mr. Arszyla's unsupported assertions to the contrary notwithstanding, Ms. Prange's trust was taken advantage of when Mr. Arszyla told her they needed to roll over the Jackson annuity, sent her signature pages purportedly to effectuate that rollover, and then used the very signatures she rendered to effectuate his designation as a beneficiary in her place.

To state a claim of elder exploitation, Connecticut General Statute sections 17b-462(a) and 17b-450 together require the following elements be established: (1) a person sixty years or older was (2) taken advantage of by another person (3) for "monetary, personal or other benefit, gain, or profit."  Conn. Gen. Stat. §§ 17b-462(a), 17b-450(1), 17b-450 (7).  Ms. Prange has shown probable cause that she can satisfy all of the statutory elements because she was over sixty when her brother took advantage of her trust and relative lack of knowledge about Monica's finances in order to gain the

monetary benefit of $145,223.41 for himself and divert over $181,000 from Ms. Prange. Tr. Vol. II at 244:22–24.

    D.    <u>Mr. Arszyla's Affirmative Defense of Waiver[7]</u>

Finally, Mr. Arszyla also argues that Ms. Prange "waived any rights to recover" under any of her claims "by agreeing to the [beneficiary] changes" before signing the forms. Def.'s Mem. at 12. Because this court has already found, for the purposes of this Ruling, that Ms. Prange did not know of the beneficiary designation change, this argument is unavailing.

Mr. Arszyla argues further that the court "should consider [Ms. Prange]'s signature on the rollover applications as a waiver of her right to object to the beneficiary change because she signed the applications and did so with reckless disregard of her fiduciary duty." Id. at 12. Ms. Prange "cannot allege", Mr. Arszyla continues, that he "deceived her with respect to the beneficiary change, when she simply did not consider asking for or reviewing the entire application." Id. Mr. Arszyla has not identified any authority to support the application of waiver in this particular context. Nonetheless, to the extent that it is applicable, the court is again unpersuaded.

The Connecticut Supreme Court has described the doctrine of waiver as follows:

> Waiver is the intentional relinquishment or abandonment of a known right or privilege. Various statutory and contract rights may be waived. Waiver is based upon a species of the principle of estoppel and where applicable it

---

[7] Mr. Arszyla also argues, as his second affirmative defense, that Ms. Prange is "foreclosed from prevailing on any of her causes of action because of the doctrine of unclean hands." Def.'s Mem. at 12. The court does not address this defense because the doctrine of unclean hands operates to bar only equitable relief. It is applied "where the party asking for the invocation of an <u>equitable doctrine</u> has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." <u>Zhang v. Zhang</u>, 2022 WL 2047793 at *2 (2d Cir. 2022) (summary order) (emphasis added) (internal quotations and citations omitted). The only equitable doctrines Ms. Prange sought to invoke in her Complaint were those of unjust enrichment and constructive trust, neither of which are addressed in this Ruling. Mr. Arszyla's defense of unclean hands is, therefore, not addressed as it is irrelevant to Counts One and Two, claims sounding in law.

16

> will be enforced as the estoppel would be enforced.  Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed.  Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied.

C.R. Klewin Ne., LLC v. City of Bridgeport, 282 Conn. 54, 87 (2007) (internal quotations, alterations and citations omitted.  Nothing in the evidence presented in connection with the PJR Motion and credited by the court supports an inference of waiver.

After Mr. Arszyla became co-agent under the power of attorney, Ms. Prange stopped "receiv[ing] paperwork for [her] aunt that required [her] brother's input".  Tr. Vol. I at 92:2–22.  Indeed, a reasonable interpretation of the facts presented to this court is that Mr. Arszyla requested and was granted his position as co-agent under the power of attorney specifically to make it easier for him to exclusively handle Monica's financial matters, including her investments in annuities.  See, e.g., id. at 49:20–50:8; Tr. Vol. II at 175:18–25, 180:11–25.  When Ms. Prange was asked directly why, despite the fact that she did not believe that the PDFs provided in his June 2, 2020 email constituted the entire application to roll over the Jackson Annuity, she did not "ask for all [of] the paperwork", she replied simply: "Because I trusted my brother."  Tr. Vol. I at 107:1–9.

Mr. Arszyla is Ms. Prange's brother, and he not only specifically handled financial matters as co-agent under the power of attorney, but also obtained that position, at his request and with Ms. Prange's assistance, for the express purpose of doing so.  Id. at 49:20–50:5.  The court cannot conclude, for purposes of this Ruling, that these circumstances were such that it is reasonable to treat Ms. Prange's faith in her brother as "conduct" that "absolutely preclude[s]" her from seeking relief from this court.  C.R.

<u>Klewin Ne., LLC</u>, 282 Conn. at 87.  The court does not find that Mr. Arszyla has shown

probable cause that Ms. Prange's claims are barred by the doctrine of waiver.

      E.    <u>PJR Amount</u>

      As relates to Counts One and Two of the Complaint, for which Ms. Prange has

established probable cause to support a PJR award, Ms. Prange seeks actual and

punitive damages under the elder law statute, as well as attorney's fees, costs, and

expenses.  Pl.'s Mem. at 8–9; <u>see also</u> Compl. ¶¶ 33, 41; <u>id.</u> at p. 11 ¶ 3 (including

punitive damages in the Prayer for Relief).  She alleges actual damages in the amount

of $181,529.27, or fifty percent of the date-of-death value of the Nationwide annuity, <u>see</u>

Nationwide DoD Value Letter, plus interest, Pl.'s Mem. at 9.  She alleges punitive

damages, <u>id.</u>, but Mr. Arszyla argues that she is not entitled to them because she "made

no request for an amount of punitive damages[,]" Def.'s Mem. at 13.

      Count Two sounds in common law.  Connecticut common law allows punitive

damages where the evidence supports a finding of an intentional and wanton violation

of the rights of others.  <u>See</u> <u>Berry v. Loiseau</u>, 223 Conn. 786, 811 (1992).  If awarded,

common law punitive damages are restricted to the reasonable cost of the litigation,

less taxable costs.  <u>See</u> <u>Markey v. Santangelo</u>, 195 Conn. 76, 80–81 (1985).  Count

One, however, specifically authorizes both attorney's fees and punitive damages.  <u>See</u>

Conn. Gen. Stat. § 17b-462(a) (stating that an "elderly person who has been the victim

of[, <u>inter alia</u>,] . . . exploitation . . . may recover actual and punitive damages . . .

together with costs and a reasonable attorney's fee").  As Ms. Prange points out,

Connecticut courts have held that the term "punitive damages" should be construed

more broadly than the common law definition when the statute authorizing it also

expressly refers to attorney's fees as another form of recovery.  For example, the

Connecticut Supreme Court "conclude[d] that the legislature did not intend to limit

punitive damages awards [ ] to . . . attorney's fees [because the Connecticut Unfair

Trade Practices Act (CUTPA)'s text] . . . expressly authorizes the trial court to award

punitive damages in addition to the award of attorney's fees . . . ." Ulbrich v. Groth, 310

Conn. 375, 499 (2013) (emphasis in original); see also Bifolck v. Philip Morris, Inc., 324

Conn. 402, 453–54 (2016) (concluding same for product liability statute).

To show a basis for the recovery of punitive damages, the pleadings must allege

qualifying conduct and sufficiently inform the court and opposing counsel that the

plaintiff seeks such damages.  See Markey,195 Conn. at 76.  Upon proof of such

conduct, claims under Connecticut's elder exploitation statute, as well as those

sounding in fraud, may be a basis to award punitive damages.  See Conn. Gen. Stat. §

17b-462(a); N. Tankers Ltd. v. Backstrom, 967 F.Supp. 1391, 1419 (D. Conn. 1997).

Mr. Arszyla's argument, that a specific amount of punitive damages must be

alleged in order to recover punitive damages, is not squarely supported by Connecticut

law.  Indeed, some Connecticut courts have even granted PJR Motions to plaintiffs who,

like Ms. Prange, do not request a specific dollar amount of punitive damages.  See, e.g.,

Sheehan v. Jendraszek, No. KNL-CV22-5023398 S, 2022 WL 6408953 (Conn. Super.

Ct. Sept. 13, 2022) (granting PJR for the amount requested by plaintiff notwithstanding

the fact that the amount exceeded actual economic damages, recognizing that "[t]he

plaintiff is also entitled to recover . . .  punitive damages in the event that the fact-finder

concludes defendant's actions were intentional"); but see also 49 Com. Parkway, LLC v.

Salomonsen, No. CV054003766, 2006 WL 696501 (Conn. Super. Ct. Mar. 3, 2006)

(declining to award full requested amount on PJR Motion because, even if the court

19

could "conclude . . . using a probable cause standard . . . that . . . the plaintiffs [were entitled] to punitive damages[,]" the plaintiffs did not provide "any evidence to support th[e] naked contention" that their requested punitive amount of "$30,000 [worth of] attorneys fees w[as] reasonable").

Here, Ms. Prange has sufficiently alleged facts and presented evidence supporting probable cause for a finding of intentional conduct which supports both her claim of elder exploitation and that of fraudulent nondisclosure.  See, e.g., Berry v. Loiseau, 223 Conn. 786, 811 (1992) (explaining that, "[i]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights") (internal citations omitted). Additionally, she has clearly informed the court and opposing counsel of her intention to seek punitive damages, including attorney's fees.  See Pl.'s Mem. at 9; see also Compl. ¶¶ 33, 41; id. at p. 11 ¶ 3.  Based on the record before this court, and the strong showing of probable cause by Ms. Prange, Ms. Prange appears to have come forward with evidence which could support a probable cause finding of entitlement to punitive damages in the form of attorney's fees under Count Two or statutory punitive damages under Count One.  However, Ms. Prange did not present evidence, nor brief, as to the amount with regard to attorney's fees under Count Two (fraudulent misrepresentation). Further, she did not make any argument as to the amount of punitive damages under Count One (elder exploitation).

Because Connecticut's PJR statute permits the court to grant a PJR request either "as requested or as modified by the court[,]" Conn. Gen. Stat. § 52-278d(a)(1) (emphasis added), the court modifies Ms. Prange's requested amount and awards an

attachment in the amount of $221,529.27.  This figure encompasses Ms. Prange's

claimed actual damages figure of $181,529.27, plus reasonable interest since the

annuity payout and for two additional years of litigation.  The court does, however,

permit Ms. Prange the opportunity to submit evidence on attorney's fees and arguments

supporting an award of punitive damages and attorney's fees in accordance with the

instructions below.

## V.     CONCLUSION

For the reasons discussed above, Ms. Prange's Motion for Prejudgment Remedy

(Doc. No. 3) is granted in the amount of $221,529.27.  The court does not require Ms.

Prange to post a bond, because, <u>inter alia</u>, of the strength of her case as to the two

Counts discussed in this Ruling.

If Mr. Arszyla wishes to substitute a bond for this remedy pursuant to Connecticut

General Statute section 52-278d(a)(4), he may seek leave of this court to do so

according to the Federal Rules of Civil Procedure and this District's Local Rules.

If she chooses, Ms. Prange may, within two (2) weeks from the entry of this

Ruling, submit documentation and a supplemental memorandum for a specific amount

of punitive damages or attorney's fees to be added to the PJR granted in this Ruling.

Mr. Arszyla must file any opposition two (2) weeks after the date that Ms. Prange

dockets her submission.  This court will address any additional PJR amount based on

punitive damages and attorney's fees after consideration of these supplemental

submissions.

**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of January 2023.


<u>    /s/ Janet C. Hall    </u>
Janet C. Hall
United States District Judge